# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

GOVERNMENT EMPLOYEES
INSURANCE CO., *et al.*,

      Plaintiffs,

v.                                        Case No.: 8:17-cv-02848-EAK-TGW

LANDAU & ASSOCIATES,
P.A., *et al.*,

      Defendants.

_____

## ORDER

Loaded with five hundred fifty-three paragraphs, replete with examples of allegedly unlawful conduct, and nearly two hundred pages in length—eight thousand seven hundred ninety-three pages when including the attached exhibit—GEICO's complaint details a complex scheme, in which thousands of fraudulent no-fault charges were submitted to GEICO for medically unnecessary or fraudulent services provided to victims of automobile accidents. Yet, the remaining defendants in this action contend GEICO's pleading is unsatisfactory and insufficient. With the exception of two claims, the Court disagrees. For the reasons stated below, Counts IV and V of GEICO's complaint are due to be dismissed without prejudice, to GEICO's right to file an amended complaint to correct the errors in those claims. The remainder of GEICO's complaint will survive.

## I.   Factual Background

### a. Introduction

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Co. (collectively, "**GEICO**") are Maryland corporations, (Doc. 1 ¶8), and wholly-owned subsidiaries of GEICO Corporation. (Doc. 21 at 21). GEICO is authorized to conduct business and issue automobile insurance policies in Florida. (Doc. 1 ¶8). GEICO initiated this action against eighteen defendants, seeking to recover more than $15 million that all eighteen original defendants allegedly obtained from GEICO by submitting, or causing to be submitted, thousands of fraudulent no-fault (also known as "personal injury protection" or "PIP") insurance charges. *Id.* at ¶1. These allegedly fraudulent charges were submitted "through" Defendant Path Medical, LLC ("**Path Medical**"), a Florida limited liability company that owned and operated numerous healthcare clinics throughout Florida. *Id.* at ¶¶ 2–3. As explained in further detail herein, GEICO alleges that the charges pertained to "medically unnecessary, illusory, unlawful, and otherwise unreimbursable [sic]" healthcare services provided by such clinics to automobile accident victims who were eligible for coverage under Florida no-fault insurance policies provided by GEICO. *Id.* at ¶1.

Following the dismissal of several of the original defendants in October 2018, only five defendants remain: Todd Landau ("**Landau**"), Landau and Associates, P.A. ("**L&A**"), The Law Offices of Kanner & Pintaluga, P.A. ("**K&P**"), Howard Kanner

Case No.: 8:17-cv-02848-EAK-TGW

("**Kanner**"), and Eric Pintaluga ("**Pintaluga**" and, together with Landau, L&A, K&P, and Kanner, the "**Remaining Defendants**"). (Docs. 110, 111).

### b. *No-Fault Law*

The Florida Motor Vehicle No-Fault Law (the "**No-Fault Law**") serves as the backdrop for the lawsuit. The No-Fault Law is designed to

> [P]rovide for medical, surgical, funeral, and disability insurance benefits without regard to fault, and to require motor vehicle insurance securing such benefits, for motor vehicles required to be registered in this state and, with respect to motor vehicle accidents, a limitation on the right to claim damages for pain, suffering, mental anguish, and inconvenience.

Fla. Stat. § 627.731. To that end, the No-Fault Law "requires that Florida automobile insurance policy holders have PIP coverage to provide victims of motor vehicle accidents benefits for reasonable, necessary, related[,] and lawful treatment, without regard to fault." *State Farm Mut. Auto. Ins. Co. & State Farm Fire & Cas. Co. v. B&A Diagnostic, Inc.*, 145 F. Supp. 3d 1154, 1163 (S.D. Fla. 2015) (citing Fla. Stat. §§ 627.730–627.7405). A healthcare services provider who lawfully provides treatment to an injured insured for a bodily injury covered by a PIP insurance plan may charge the insurer, and the insurer may directly pay for such charges to the provider. *See* Fla. Stat. § 627.736(5).

Significantly, the No-Fault Law provides that an insurer is not required to pay a claim or charges for "any service or treatment that was not lawful at the time rendered." *Id.* § 627.736(5)(b)(1)(b). "Lawful" or "lawfully" is statutorily defined as

"in substantial compliance with all relevant criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." *Id.* § 627.732(11). Furthermore, a service provider may charge an insurer only "a reasonable amount" for the provided services. *Id.* § 627.736(5)(a). As discussed in more detail below, GEICO contends that it paid thousands of fraudulent charges on a continuous basis over the course of three years on payments that Path Medical's clinics were ineligible to receive under the No-Fault Law. (Doc. 1 ¶504).

### c. *Acquisition of the Clinics, the Development of Path Holdings, and the Formation of the 411-PAIN Entities*

In the early 1990s, Robert Lewin ("**Lewin**") and Guy Shapiro established a chain of chiropractic offices in Florida to specialize in treating victims of automobile accidents. (Doc. 1 ¶114). Following Shapiro's death in 2007, Lewin assumed control of the chain of offices. *Id.* at ¶116. By 2014, Lewin, along with his new business partners, Russell Permaul ("**Permaul**") and Joel Earl Manion ("**Manion**"), owned or controlled many chiropractic offices in Florida. *Id.* at ¶117. Lewin, Permaul, and Manion converted Path Medical, Inc., a predecessor entity they owned and controlled, into Path Medical in November 2015. *Id.* at ¶119. To consolidate the chiropractic offices throughout Florida and supposedly insulate Lewin, Permaul, and Manion from liability, Path Medical subsequently acquired or merged with the chiropractic offices. *Id.* at ¶¶ 118, 120. Path Medical, Lewin, Permaul, and Manion ensured that each acquired or merged office was licensed as a healthcare clinic. *Id.* at ¶122.

In October 2016, Lewin, Permaul, and Manion incorporated Path Medical Center Holdings, Inc. ("**Path Holdings**") which, like Path Medical, was owned by Lewin, Permaul, and Manion. *Id.* at ¶123. However, Lewin, Permaul, and Manion thereafter transferred ownership of Path Medical to Path Holdings, thereby resulting in Lewin, Permaul, and Manion owning and controlling Path Holdings, which in turn owned and controlled Path Medical, which operated the clinics throughout Florida. *Id.* at ¶¶124–25. GEICO alleges that Lewin, Permaul, and Manion transferred ownership of Path Medical to Path Holdings to "further insulate themselves from liability for their" practices at the clinics and conceal the "collusive and unlawful self-referral, cross-referral, and patient brokering scheme" alleged in the complaint. *Id.* at ¶¶126–27.

Simultaneous with the acquisition of various chiropractic offices throughout Florida, which would ultimately become the clinics operated by Path Medical, Lewin and Shapiro obtained the "1-800-411-PAIN" toll-free number in 1997. *Id.* at ¶128. Between 1997 and 2007, Lewin and Shapiro "spent millions of dollars" using this toll-free number to advertise for the various chiropractic offices, as well as a personal injury attorney referral service. *Id.* at ¶130. Following a lawsuit and increased public scrutiny, Lewin and Harley Lewin ("**H. Lewin**") organized 1-800-411-PAIN Referral Service, LLC ("**411-PAIN**") and 1-800-411-I.P. Holdings, LLC ("**411-IP**") so that Lewin could reorganize the entire referral service and thus "insulate himself and his chiropractic offices from liability." *Id.* at ¶¶134–35, 137.

Lewin subsequently transferred his ownership of the "411PAIN" trademark and related trademarks, which he received via an assignment from Shapiro's estate following Shapiro's death in 2007, to 411-IP. *Id.* at ¶¶ 132, 137. Consequently, 411-IP operated as the owner of the "411PAIN" trademark and the related trademarks. *Id.* at ¶138. 411-IP also licensed the trademarks to 411-PAIN, which in turn used the trademarks to operate the 1-800-411-PAIN healthcare and personal injury attorney referral service.[1] *Id.*

GEICO contends that Lewin, as a licensed chiropractor, could not refer automobile accident victims directly or indirectly to the Path Medical clinics for healthcare services without violating Florida's Patient Self-Referral Act of 1992, Fla. Stat. § 456.053 (the "**Self-Referral Act**").[2] *Id.* at ¶151. Similarly, GEICO alleges, Lewin would violate the Self-Referral Act by referring an automobile accident victim directly or indirectly to a personal injury attorney with the understanding that such attorney would thereafter cross-refer the victim to a Path Medical clinic in consideration for the initial referral "or anything else." *Id.* at ¶152. At the same time, however, Lewin, Manion, Permaul, Path Medical, and Path Holdings "needed to

---

[1] The complaint alleges that Lewin, H. Lewin, and 411 PAIN Advertising Group, Inc. ("**411 Advertising**") also used the trademarks for this purpose. (Doc. 1 ¶ 138).

[2] Except as otherwise provided, the Self-Referral Act prohibits a "health care provider" from referring a patient for "the provision of designated health services to an entity in which the health care provider is an investor or has an investment interest." Fla. Stat. § 456.053(5)(a). Furthermore, "[a]ny health care provider or other entity that enters into an arrangement or scheme, such as a cross-referral arrangement, which the physician or entity knows or should known has a principal purpose of assuring referrals by the physician to a particular entity which, if the physician directly made referrals to such entity, would violation this section . . . ." *Id.* § 456.053(5)(f). Any entity who collects an amount billed in violation of section 456.053(5) must refund such amount "on a timely basis" to the individual or payor. *Id.* § 456.053(c).

ensure a steady flow of patients into the Path Medical clinics so that they could submit billing to GEICO and other insurers [to] generate [a] profit." *Id.* at ¶153.

### d. The Remaining Defendants' Involvement

This desire to generate a profit by billing GEICO is the basis for the Remaining Defendants entering the scene. According to the complaint, Lewin, Permaul, Manion, Path Holdings, Path Medical, H. Lewin, 411 Advertising, 411-PAIN, 411-IP, and the Remaining Defendants entered into a cross-referral arrangement, by which they allegedly agreed to cause the insureds solicited by 411-PAIN to be "self-referred" to the Path Medical clinics in violation of the Self-Referral Act, all while concealing both the nature and extent of the unlawful referrals. *Id.* at ¶155. The arrangement operated as follows: in exchange for referral of a new personal injury client from 411-PAIN, Kanner, Pintaluga, and K&P would then cross-refer that client to a Path Medical clinic. *Id.* at ¶ 161. The Path Medical clinics would provide healthcare services to the clients—the merits of which GEICO vehemently attacks throughout the complaint— or claim to provide healthcare services to the clients when no such services were provided, and Path Holdings, Path Medical, Lewin, Permaul, and Manion would subsequently bill GEICO via the United States mail for these services. *See generally id.* at ¶162. Path Medical, Path Holdings, Lewin, Permaul, and Manion would fail to timely reimburse GEICO under the Self-Referral Act for those payments made by GEICO. *Id.* Supposedly as further consideration for the cross-referral, Path Medical would subsequently retain L&A, which Landau, Kanner, and Pintaluga owned, to

pursue collection of Path Medical's billing to GEICO, which would apparently generate "massive" attorney's fees to L&A, Landau, Kanner, and Pintaluga. *Id.* at ¶161. GEICO also contends that these actions by all eighteen original defendants constituted violations of Florida's Patient Brokering Act, Fla. Stat. § 817.505 (the "**Patient Brokering Act**"), and Florida's Anti-Kickback Statute, Fla. Stat. § 456.054 (the "**Anti-Kickback Statute**").[3] *Id.* at ¶194.

An example—and the complaint provides examples in abundance—paints the entire picture: an automobile accident victim eligible for PIP benefits through a GEICO policy is involved in an automobile accident. *Id.* at ¶162. The victim subsequently calls 411-PAIN, owned and controlled by Lewin and H. Lewin, *id.* at ¶2, which refers the victim, often at Lewin or H. Lewin's direction, to K&P. *Id.* K&P, owned by Kanner and Pintaluga, next refers the victim, at the direction of Kanner and Pintaluga, to a clinic operated by Path Medical, *id.* at ¶162, which is owned and controlled by Path Holdings, which Lewin, Permaul, and Manion control.[4] *Id.* at ¶124-

---

[3] The Patient Brokering Act makes it unlawful for any person to "offer or pay a commission, benefit, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, to induce the referral of a patient or patronage to or from a healthcare provider or health care facility." Fla. Stat. § 817.505(1)(a). The Patient Brokering Act also makes it unlawful for any person to "solicit or receive a commission, benefit, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for referring a patient or patronage to or from a healthcare provider or healthcare facility." *Id.* § 817.505(1)(b). Furthermore, the Anti-Kickback Statute prohibits "any healthcare provider or any provider of healthcare services to offer, pay, solicit, or receive a kickback, directly or indirectly, overtly or covertly, in cash or in kind, for referring or soliciting patients." Fla. Stat. § 456.054(2). "Kickback" is statutorily defined as "a remuneration or payment, by or on behalf of a provider of health care services or items, to any person as an incentive or inducement to refer patients for past or future services or items, when the payment is not tax deductible as an ordinary and necessary expense," *id.* § 456.054(1).

[4] GEICO contends that at least fifteen percent of the thousands of GEICO insureds who reportedly received treatment at a Path Medical clinic were represented by Kanner, Pintaluga, and K&P in personal injury cases. (Doc. 1 at ¶162). Relatedly, GEICO also lists nine other personal injury law firms who allegedly "entered into

25. GEICO contends this exchange violates the Self-Referral Act, the Patient Brokering Act, and Anti-Kickback Statute. *Id.* at ¶¶ 161, 194. After the victim allegedly receives medically unnecessary or fraudulent healthcare services, Path Holdings, Path Medical, Lewin, Permaul, and Manion bill GEICO via the United States mail for these services and subsequently fail to refund any resulting payment on a "timely basis," Fla. Stat. § 456.053(5)(d), in violation of the Self-Referral Act. *Id.* at ¶162. The allegedly inaccurate or exaggerated healthcare services also purportedly serve as false grounds for personal injury attorneys filing lawsuits on behalf of the victim, such as Kanner, Pintaluga, and K&P. *Id.* at ¶335. As further consideration for the cross-referral, Path Holdings, Path Medical, Lewin, Permaul, and Manion agree to retain L&A, owned by Landau, Kanner, and Pintaluga, to pursue collection of Path Medical's bills to GEICO, thereby generating attorney's fees for L&A, Landau, Kanner, and Pintaluga.[5] *Id.* at ¶ 194. GEICO asserts that this further consideration also violates the Self-Referral Act, the Patient Brokering Act, and Anti-Kickback Statute. *Id.* at ¶¶ 161, 194.

GEICO contends the scheme did not end there, however. These personal injury referrals from 411-PAIN to K&P and the "lucrative right" for L&A to pursue collection of Path Medical's bills to GEICO allegedly were not "sufficient" to

---

collusive and unlawful self-referral arrangements" with Lewin, Permaul, Manion, Path Holdings, Path Medical, 411 Advertising, 411-PAIN, and 411-IP. *Id.* at ¶167.

[5] The complaint also alleges that L&A has represented Path Medical in at least ninety percent of the collections lawsuits filed by Path Medical since 2015. (Doc. 1 ¶165).

compensate Kanner, Pintaluga, and K&P. *Id.* at ¶200. Consequently, Lewin, H. Lewin, 411 Advertising, 411-PAIN, 411-IP, Landau, Kanner, and Pintaluga "entered into a secret scheme to funnel additional consideration to Kanner and Pintaluga in exchange for their collusive and unlawful cross-referrals to the Path Medical clinics." *Id.* at ¶201.

Specifically, GEICO alleges that Landau, Kanner, and Pintaluga agreed to form Motor City Accident Attorneys, P.L.L.C. ("**MCAA**"), a Michigan law firm with Landau, Kanner, and Pintaluga as its members. *Id.* at ¶202. With the formation of MCAA, Lewin, H. Lewin, 411 Advertising, 411-PAIN, 411-IP, Landau, Kanner, and Pintaluga allegedly agreed to reach out to personal injury attorneys in Michigan and offer such attorneys an opportunity to participate in the 411-PAIN referral service network. *Id.* In exchange for the opportunity to participate in the 411-PAIN referral service network, the Michigan personal injury attorneys agreed to pay MCAA, of which Landau, Kanner, and Pintaluga were members, up to fifty percent of the settlements in personal injury cases arising from participation in the 411-PAIN referral service network as compensation for MCAA's purported services as "co-counsel" on such cases. *Id.* GEICO alleges that MCAA never served as genuine co-counsel on these cases, however; instead, according to GEICO, the compensation MCAA received from the Michigan personal injury attorneys who participated in the 411-PAIN referral service network was "additional, disguised consideration in exchange for Kanner,

Pintaluga, and K&P's collusive cross-referrals to the Path Medical clinics in Florida."
*Id.*

GEICO extensively describes the fraudulent treatment and billing protocol that allegedly occurred at the various Path Medical clinics, including, without limitation: misrepresenting the severity of the victims' medical conditions, the amount of time the examining physician or chiropractor spent with the victims or victims' families, the extent of the physical examinations, the extent of complexity involved in the medical decision-making, the nature or results of follow-up examinations, and the necessity for physical therapy services.[6] *Id.* at ¶¶ 350–481. The HCFA-1500 forms and treatment reports that were submitted to GEICO misrepresented to GEICO: (i) Path Medical's compliance with the Self-Referral Act, the Patient Brokering Act, the Anti-Kickback Statute, certain chiropractor advertising laws, and Florida's Health Care Clinic Act, Fla. Stat. § 400.990 *et seq.*, thus misrepresenting that it was eligible to collect PIP benefits; (ii) that the Path Medical clinics' healthcare services, to the extent they were provided at all, were lawfully provided, medically necessary, and eligible for PIP reimbursement; and (iii) the level and nature of the Path Medical clinics' healthcare services.

---

[6] In addition to the Remaining Defendants, GEICO's complaint also named Michael H. Wilensky, M.D., David A. Cheesman, D.O., Tie Qian, M.D., and Ralph G. Marino, M.D. (collectively, the "**Medical Directors**") as defendants to the action, but the Court dismissed the action against the Medical Directors with prejudice. (Docs. 110, 111). The Medical Directors falsely purported to serve as designated medical directors at certain Path Medical clinics. (Doc. 1 ¶¶ 51, 62, 71).

## II.    Procedural History

GEICO filed its complaint on November 27, 2017. (Doc. 1). Through the complaint, GEICO alleges five causes of action against the Remaining Defendants: (1) conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("**RICO**"), 18 U.S.C. § 1962(d)); (2) violation of the Florida Deceptive and Unfair Trade Practices Act ("**FDUTPA**"), Fla. Stat. § 501.201 *et seq.*; (3) violation of the Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.101 *et seq.* ("**Florida RICO**"); (4) aiding and abetting fraud; and (5) unjust enrichment. *Id.* at ¶¶510–32, 539–54. The Court previously denied the Remaining Defendants' motions to dismiss without prejudice, granting the Remaining Defendants leave to amend such motions. (Doc. 79). In response, Landau filed his Amended Motion to Dismiss Complaint, (Doc. 80); Kanner, Pintaluga, and K&P filed their Amended Motion to Dismiss and Strike Allegations, (Doc. 81); and L&A filed its Amended Motion to Dismiss Plaintiffs' Complaint for Failure to State a Claim, (Doc. 83). GEICO responded in opposition. (Docs. 89, 91, 92). Thus, the amended motions to dismiss are ripe for consideration.

## III.    Legal Standard

A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P 8(a)(2). Although Rule 8's pleading standard does not demand detailed factual allegations, it requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For a complaint to survive a motion to dismiss, it must contain

"sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). In evaluating the sufficiency of the complaint under the amended motions to dismiss, the Court must accept as true all of the complaint's allegations and view the facts in the light most favorable to GEICO. *Rowe v. Mentor Worldwide, LLC*, 297 F. Supp. 3d 1288, 1292 (M.D. Fla. 2018) (citing *Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007)).

Additionally, a party who alleges fraud or mistake shall "state with particularity the circumstances constituting the fraud or mistake." Fed. R. Civ. P. 9(b). The purpose of Rule 9(b) is to alert defendants "to the precise misconduct with which they are charged" and to protect defendants "against spurious charges of immoral and fraudulent behavior." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370–71 (11th Cir. 1997). Rule 9(b) does "not abrogate the concept of notice pleading," but "is satisfied if the complaint sets forth (1) precisely what statements or omissions were made in what documents . . . (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them, (3) the content of such statements and the manner in which they [were

misleading], and (4) what the defendants obtained as a consequence of the fraud." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (internal quotations omitted). Failure to satisfy Rule 9(b) is grounds for dismissal. *Corsello v. Lincare, Inc.*, 28 F.3d 1008, 1012 (11th Cir. 2005). Of course, Rule 9(b)'s pleading requirements for fraud or mistake claims "do not allow a plaintiff to 'evade the less rigid—though still operative—strictures of Rule 8.'" *Silverthorne v. Yeaman*, 668 F. App'x 354, 355 (11th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 686–87).

## IV.   **Discussion**

Seeking to fend off GEICO's allegations, the Remaining Defendants launch a myriad of attacks against the complaint. The Court addresses these challenges in turn. For the reasons set forth more fully herein, the Court dismisses without prejudice the FDUTPA claim (Count IV) and the Florida RICO claim (Count V). GEICO has sufficiently pleaded the remaining claims under applicable pleading standards. While not a model for straightforward pleading, the complaint readily provides the Remaining Defendants with fair notice of their wrongdoing. As the parties are undoubtedly aware, the purpose of a motion brought under Federal Rule of Civil Procedure 12(b)(6), such as the instant amended motions to dismiss, is to test the facial sufficiency of the complaint. With the exception of the FDUTPA claim and the Florida RICO claim, the complaint passes that test. Of course, whether GEICO will be able to uncover evidence, through discovery, to advance its case to summary judgment, or beyond, is an issue separate from this Court's current examination.

### a. Preliminary Matters

### i. Rule 9(b) Pleading Requirement

The Remaining Defendants argue that GEICO fails to sufficiently plead its fraud-based claims. *See generally* (Docs. 80, 81, and 83). As discussed in further detail below, GEICO's FDUTPA and Florida RICO claims are due to be dismissed without prejudice. GEICO's remaining claims—RICO, aiding and abetting fraud, and unjust enrichment—are subject to Rule 9(b). *Miccosukee Tribe of Indians of Fla. v. Cypress*, 814 F.3d 1202, 1212 (11th Cir. 2015) (applying the pleading standards of *Twombly*, *Iqbal*, and Rule 9(b) to the complaint, which pleaded RICO claims); *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1064–65 (11th Cir. 2007) (applying Rule 9(b) to an aiding and abetting fraud claim); *Allstate Indem. Co. v. Fla. Rehab & Injury Ctrs. Longwood, Inc.*, No. 6:15-cv-1740-Orl-41GJK, 2016 WL 7177624, at *3 (M.D. Fla. July 26, 2016) (applying Rule 9(b) to an unjust enrichment claim which, like GEICO's unjust enrichment claim, was grounded in fraud).[7]

---

[7] Caselaw within the Eleventh Circuit reflects some inconsistency as to whether Rule 9(b)'s particularity requirement applies to RICO conspiracy claims. For example, in *Associated Industries Insurance Company, Inc. v. Advanced Management Services, Inc.*, the Southern District of Florida explained that "Rule 9(b)'s particularity requirement does not apply to RICO conspiracy claims." No. 12-80393-CIV, 2014 WL 1237685, at *7 n.7 (S.D. Fla. Mar. 26, 2014) (citing *O'Malley v. O'Neill*, 887 F.2d 1557, 1560 (11th Cir. 1989)). Similarly, in *Sun Life Assurance Company of Canada v. Imperial Premium Finance, LLC*, a panel of the Eleventh Circuit Court of Appeals evaluated the plaintiff's RICO conspiracy claim and concluded it was "certainly plausible." 904 F.3d 1197, 1214 (11th Cir. 2014). However, RICO conspiracy claims have been analyzed under Rule 9(b)'s particularity standard in other instances. *See, e.g.*, *Miccosukee Tribe of Indians of Fla*, 814 F.3d at 1212 (applying Rule 9(b) to the RICO complaint preliminarily before holding the complaint failed to meet the plausibility standard); *Lawrie v. Ginn Dev. Co., LLC*, 656 F. App'x 464, 474 (11th Cir. 2016) (evaluating the plaintiff's RICO conspiracy claim under Rule 9(b)). Despite any inconsistency, the RICO conspiracy claim here meets the pleading standards articulated in *Twombly* and *Iqbal*, as well as Rule 9(b).

The "most basic consideration" rooted in Rule 9(b) is fair notice. *Brooks*, 116 F.3d at 1381 (citing *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 778 (7th Cir. 1994)) (internal quotations omitted). Indeed, a plaintiff who pleads fraud is required to provide reasonable notice to the defendants regarding their alleged role in the scheme. *Brooks*, 116 F.3d at 1381. Consequently, for those cases involving multiple defendants, the plaintiff must inform each defendant of "the nature of his alleged participation in the fraud." *Id.* (internal quotations omitted).

GEICO pleads these fraud-based claims with sufficient particularity under Rule 9(b). The complaint details the Remaining Defendants' individual roles in the fraudulent scheme, explains how each of the Remaining Defendants' actions furthered the scheme, and articulates the Remaining Defendants' received consideration. Furthermore, the Remaining Defendants' relationships with each other and other parties is described in detail. The complaint contains numerous examples of the arrangement in support, which incorporate dates and specify the involved parties and their actions. Furthermore, through the attached exhibit, GEICO provides a comprehensive listing of the bills submitted to GEICO as a result of the fraud, which includes the claim number, provider, document mailed, approximate date of mailing, CPT code, number of units, and charge for each event. The exhibit includes over eight thousand pages of allegedly fraudulent billing, with a wealth of variety among claims. GEICO also extensively outlines the basis for the unlawful activity, the nature of Path Medical's allegedly fraudulent services, and the misrepresentations made to GEICO.

GEICO's complaint, taken together with the exhibit, satisfies the purpose of Rule 9(b) to provide the Remaining Defendants with fair notice of their alleged wrongdoing. Here, the Remaining Defendants cannot reasonably assert that the complaint fails to provide them with notice of their alleged wrongdoing. The Court has determined each of the Remaining Defendants' alleged wrongdoing based on its reading of the complaint. The Remaining Defendants undoubtedly have the ability to do the same.

Finally, Landau and L&A assert that some of GEICO's allegations are improperly predicated upon GEICO's "information and belief." (Docs. 80 at 6; 83 at 5). Allegations of fraud founded upon information and belief typically do not satisfy Rule 9(b)'s particularity requirement. *S.E.C. v. Physicians Guardian Unit Inv. Trust ex rel. Physicians Guardian, Inc.*, 72 F. Supp. 2d 1342, 1352 (M.D. Fla. 1999); *In re Checkers Sec. Litig.*, 858 F. Supp. 1168, 1178 (M.D. Fla. 1994). However, pleading upon information and belief is permitted under Rule 9(b) when factual information regarding the purported fraud is "peculiarly within the defendant's knowledge or control." *Hill v. Morehouse Med. Assocs., Inc.*, No. 02-14429, 2003 WL 22019936, at *3 (11th Cir. Aug. 15, 2003). *See also In re Checkers Sec. Litig.*, 858 F. Supp. at 1178. For this exception to apply, "the complaint still must supply enough factual allegations to make [the plaintiff's] theoretically viable claim plausible." *Kendall v. Boston Scientific Corp.*, No. 6:17-cv-1888-Orl-37-GJK, 2018 WL 3343239, at *4 (M.D. Fla. June 25, 2018) (citing *Hill*, 2003 WL 22019936, at *3).

Here, the complaint alleges a complex scheme, in which thousands of fraudulent no-fault charges were submitted to GEICO for medically unnecessary or fraudulent services provided to GEICO's insureds. As detailed in the complaint, the Remaining Defendants each held a role in the purported scheme to submit, or cause to be submitted, the bills for such services to GEICO. In this context, factual information regarding the fraudulent scheme is "peculiarly within [the Remaining Defendants'] knowledge or control." *Hill*, 2003 WL 22019936. Except as otherwise provided herein, the complaint supplies satisfactory allegations to deem sufficient, for pleading purposes, GEICO's theoretically viable claims. Thus, Landau and L&A's argument regarding the improper predication of allegations upon GEICO's "information and belief" is rejected.

### ii.    *Shotgun Pleading*

Kanner, Pintaluga, K&P, and L&A preliminarily attack the complaint as a shotgun pleading. (Docs. 81 at 6; 83 at 5). The Eleventh Circuit Court of Appeals has identified "four rough types or categories of shotgun pleadings." *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1320 (11th Cir. 2015). Landau contends that GEICO's complaint constitutes one prohibited type of shotgun pleading, which asserts "multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Id.* at 1323. This type of shotgun pleading, like all types of shotgun pleadings, "fail[s] to one degree or another, and in one way or another, to give

the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.*

Although the complaint asserts claims against Defendants collectively, the complaint describes the alleged scheme and, significantly, each participant's role over four hundred ninety-three paragraphs. Examples of each of Defendants' alleged illegal conduct abound. As explained above and except as provided herein, each claim is sufficiently pleaded to the extent that Defendants have "adequate notice of the claims against them" and the bases for those claims. *Id.* Accordingly, the shotgun pleading argument is meritless.

### b. *Federal RICO*

Under section 1962(d) of RICO, it is unlawful to conspire to violate one of the substantive provisions of RICO, including section 1962(c). 18 U.S.C. § 1962(d). GEICO alleges that the Remaining Defendants conspired to violate section 1962(c) of RICO. (Doc. 1 ¶513). The complaint previously included a cause of action for an alleged substantive violation of RICO under section 1962(c) against Lewin, Manion, Permaul, and Path Holdings, *id.* at ¶¶502–09, but the Court dismissed with prejudice GEICO's case against those parties, (Doc. 111).[8]

---

[8] A defendant may be liable for conspiracy under section 1962(d) even without committing the substantive acts that would constitute violations of sections 1962(a), (b), or (c); instead, a defendant's agreement to participate in a RICO conspiracy is the "touchstone of liability" under section 1962(d). *United States v. Browne*, 505 F.3d 1229, 1264 (11th Cir. 2007). "Where a plaintiff fails to state a RICO claim and the conspiracy count *does not contain additional allegations*, the conspiracy claim necessarily fails." *Rogers v. Nacchio*, 241 F. App'x 602, 609 (11th Cir. 2007) (emphasis added). *See also Am. Dental Ass'n*, 605 F.3d at 1296 n.6 (declining to fashion a rule that if a plaintiff fails to state a claim of a substantive RICO violation, then that plaintiff's RICO conspiracy claim must

The Remaining Defendants argue that GEICO's complaint fails to sufficiently plead that they were part of a conspiratorial agreement. To prove a RICO conspiracy, a plaintiff "must show an agreement to violate a substantive provision of RICO." *U.S. v. Castro*, 89 F.3d 1443, 1450 (11th Cir. 1996), *cert. denied*, 519 U.S. 1118 (1997) (emphasis added). Specifically, the plaintiff must demonstrate "that the conspirators agreed to participate directly or indirectly in the affairs of an enterprise through a pattern of racketeering activity." *Castro,* 89 F.3d at 1451 (citing, *inter alia*, 18 U.S.C. § 1962(d)). Proof of the agreement is at the heart of the claim. *In re Managed Care Litigation*, 430 F. Supp. 2d 1336, 1345 (S.D. Fla. 2006).

There are two methods for establishing the requisite agreement for a RICO conspiracy claim: "(1) by showing that the defendant agreed to the overall objective of the conspiracy; or (2) by showing that the defendant agreed to commit two predicate acts." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1293(11th Cir. 2010) (quoting *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 950 (11th Cir. 1997)). When direct evidence regarding an agreement on an overall objective is absent, a plaintiff may establish such agreement through "inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." *Browne*, 505 F.3d at 1254 (quoting *United States v. Silvestri*, 409 F.3d 1311, 1328 (11th Cir. 2005)) (internal

---

fail); *In re Motel 6 Securities Litig.*, 161 F. Supp. 2d 227, 237 (S.D.N.Y. 2001) (acknowledging that it is not necessary for plaintiffs to allege a substantive violation of RICO to prove conspiracy liability, but emphasizing that section 1962(d) requires an agreement) (internal citations omitted). Thus, the section 1962(d) claim may survive the 1962(c) claim.

quotations omitted). "The existence of a conspiracy is rarely provable by direct evidence; its existence must be inferred from the circumstances." *First S. Farm Credit ACA v. Smith*, No. 7:10-cv-1409-TMP, 2010 WL 11562053, at *5 (N.D. Ala. Oct. 25, 2010), *report and recommendation adopted*, 7:10-cv-1408-TMP, 2011 WL 13229641 (N.D. Ala. Jan. 7, 2011) (citing *Am. Dental Ass'n*, 605 F.3d at 1293). Nonetheless, "allegations of Defendants' parallel conduct, absent a plausibly-alleged 'meeting of the minds,' fail to 'nudge [the plaintiff's] claims across the line from conceivable to plausible.'" *Am. Dental Ass'n*, 605 F.3d at 1296 (quoting *Twombly*, 550 U.S. at 557). Indeed, "allegations of parallel conduct, accompanied by nothing more than a bare assertion of a conspiracy, do not plausibly suggest a conspiracy . . . ." *Am. Dental Ass'n*, 605 F.3d at 1294 (citing *Twombly*, 550 U.S. at 557).

GEICO has sufficiently pleaded its RICO conspiracy claim against the Remaining Defendants. First, as discussed above, two methods exist for GEICO to show the requisite agreement for a RICO conspiracy claim: by showing the Remaining Defendants' agreement to the overall objective of the conspiracy; or by showing the Remaining Defendants agreed to commit two predicate acts. Because GEICO maintains that the Remaining Defendants "knew of, agreed to[,] and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO," (Doc. 1 ¶515), the Court's analysis proceeds under the first of these two methods.

The complaint describes the overall objective of the conspiracy as:

> [C]onducting and/or participat[ing], directly or indirectly, in the conduct of Path Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Path Medical was not eligible to receive under the No-Fault Law
> . . . .

(Doc. 1 ¶513).[9]

The complaint adds:

> The ultimate goal of [all original defendants'] fraudulent scheme not only was to generate as much fraudulent PIP billing as possible through the Path Medical clinics, but also to falsely depict the "patients" who [were] treated at the Path Medical clinics as seriously injured, and thereby create a false basis for personal injury lawsuits filed by the personal injury attorneys—including Kanner, Pintaluga, and [K&P]—who referred insureds to Path Medical clinics pursuant to [all original defendants'] collusive and unlawful cross-referral scheme.

*Id.* at ¶335. Through its responses to the amended motions to dismiss, GEICO contends that it has sufficiently alleged an agreement, even if such agreement is shown through circumstantial evidence. *See* (Docs. 89 at 13; 91 at 12, 92 at 12). An examination of the complaint to determine the veracity of this argument is thus warranted.

---

[9] The complaint also describes the acts that purportedly served as the predicate acts for the RICO claim. *See, e.g.*, (Doc. 1 ¶¶506, 514, Ex. 1).

Although the complaint's allegations and facts may support competing theories, the Court must accept as true such allegations and view the facts in the light most favorable to GEICO. *Rowe*, 297 F. Supp. 3d at 1292. Accepting the allegations as true and viewing the facts in the light most favorable to GEICO demonstrates that the complaint sufficiently shows, through circumstantial evidence, the Remaining Defendants' agreement to the overall objective of the conspiracy.

Following Kanner, Pintaluga, and K&P's receipt of a personal injury client referral from 411-PAIN (often at the direction of Lewin, H. Lewin, or both), *see, e.g.* ¶¶157, 189, Kanner, Pintaluga, and K&P would cross-refer their personal injury clients to the various Path Medical clinics (and thus right back to Lewin). (Doc. 1 ¶161). As further consideration for these cross-referrals to Path Medical by Kanner, Pintaluga, and K&P, Path Medical would retain L&A—owned by Landau, Kanner, and Pintaluga—to pursue collection of Path Medical's billing to GEICO. *Id.* Consequently, L&A would pursue collection of the bills Path Medical submitted to GEICO, thereby generating attorney's fees for Kanner and Pintaluga (based on the initial referral to Path Medical) and Landau and L&A. *Id.* The complaint provides examples of such arrangements. *Id.* at ¶173. By entering into this arrangement with Lewin, Manion, Permaul, Path Medical, Path Holdings, H. Lewin, 411-PAIN, 411-Advertising, and 411-IP, the Remaining Defendants allowed these parties to avoid scrutiny for direct referrals from the 411-PAIN referral service to the Path Medical clinics, as such direct referrals were unlawful. *Id.* at ¶160. Thus, the Remaining

Defendants' participation in the arrangement ensured compensation and shielded the other parties from scrutiny.

Path Medical, Lewin, H. Lewin, 411 Advertising, 411-PAIN, 411-IP, Landau, Kanner, and Pintaluga also set up an arrangement, whereby Michigan personal injury attorneys who agreed to participate in the 411-PAIN referral service would pay up to fifty percent of the settlements in personal injury cases arising from the referral service to MCAA as "co-counsel"—in other words, fifty percent of such settlements would be paid to Landau, Kanner, and Pintaluga. *Id.* at ¶202. Oddly, MCAA would not perform any work on these cases or serve as legitimate co-counsel on the cases, however, despite the receipt of up to fifty percent of the settlements by Landau, Kanner, and Pintaluga. *Id.* GEICO has alleged that this arrangement with MCAA in Michigan served as further consideration for the cross-referrals to Path Medical from Kanner, Pintaluga, and K&P. *Id.* As alleged, this arrangement was designed to funnel further consideration to Kanner, Pintaluga, and K&P because the referrals from 411-PAIN and the right to pursue collection on ninety percent of Path Medical's billing via L&A, *id.* at ¶165, was insufficient to compensate Kanner, Pintaluga, and K&P, *id.* at ¶200. Tellingly, the Remaining Defendants' amended motions to dismiss address the Michigan operation only in passing, if at all.

Additionally, the complaint extensively details the Path Medical clinics' deceitful, or otherwise non-existent, patient treatment procedures and billing protocols, ranging from misrepresenting the severity of the victims' medical

conditions, *id.* at ¶¶350–64, to misrepresenting the necessity for physical therapy services, *id.* at ¶¶469–77. The complaint explains that such deceitful treatment procedures and billing protocols were utilized to serve as a false basis for personal injury lawsuits filed by personal injury attorneys, including Kanner, Pintaluga, and K&P. *See, e.g., id.* at ¶¶335, 341, 364, 386, 415, 449, 458. The deceitful treatment procedures and billing protocols thus seemingly served as additional consideration for the referral of clients to Path Medical by Kanner, Pintaluga, and K&P, as Path Medical's treatment procedures and billing protocols would increase the potential value of the lawsuit filed on behalf of that referred client by Kanner, Pintaluga, and K&P.

These allegations readily provide "inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme," *Browne*, 505 F.3d at 1254, sufficient to show the Remaining Defendants' agreement to the overall objective of the conspiracy. Accepting the allegations as true and viewing the facts in the light most favorable to GEICO, the Remaining Defendants' agreement to the overall objective of the conspiracy is evidenced through their relationships with each other and the detailed consideration provided for referrals. As shown above, GEICO's allegations involve developed descriptions of the Remaining Defendants' individual roles in the arrangement, information regarding the consideration received by the Remaining Defendants, and specific examples. The allegations are certainly plausible and clearly outline how each of the Remaining Defendants benefited from their participation in

the scheme: Kanner, Pintaluga, and K&P received the initial referral from 411-PAIN (often at the direction of Lewin or H. Lewin) and the increased potential value for personal injury lawsuits filed on behalf of the client who was referred to the Path Medical clinics; Kanner and Pintaluga further received attorney's fees through L&A's pursuit of collection lawsuits against GEICO for Path Medical's inflated bills for the deceitful or nonexistent medical services, as well as up to fifty percent of settlements resulting from Michigan attorneys' participation in the 411-PAIN referral service in Michigan through MCAA, even though MCAA did not perform any work on such cases; Landau received attorney's fees through L&A's pursuit of collection lawsuits against GEICO for Path Medical's bills for the clinics' fraudulent or nonexistent medical services, as well as up to fifty percent of settlements resulting from Michigan attorneys' participation in the 411-PAIN referral service in Michigan through MCAA, despite MCAA's failure to perform any work on the cases; and L&A received lucrative attorney's fees for pursuing collection lawsuits against GEICO for Path Medical's inflated bills for the clinics' unnecessary or absent medical services, generated by the steady flow of client referrals to the Path Medical clinics. These allegations are sufficient to infer the Remaining Defendants' agreement to "submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Path Medical was not eligible to receive under the No-Fault Law." (Doc. 1 ¶513). And, as explained above, GEICO alleges that the submission of the bills via the United States mail injured GEICO's business and property in the amount of at least $15 million.

The Remaining Defendants argue that the RICO conspiracy claim must fail because they were merely providing legal services, which fails to evidence any agreement to participate in the fraudulent scheme. (Docs. 80 at 11–16; 81 at 11–12; 83 at 8–11). Courts have permitted a RICO claim against an attorney to proceed where the attorney's conduct extends beyond the provision of legal services. *See Handeen v. Lamaire*, 112 F.3d 1339, 1349 (8th Cir. 1997) ("Behavior prohibited by [section] 1962(c) will violate RICO regardless of the person to whom it may be attributed, and we will not shrink from finding an attorney liable when he crosses the line between traditional rendition of legal services and active participation in directing the enterprise."); *Tribune Co. v. Purcigliotti*, 869 F. Supp. 1076, 1098 (S.D.N.Y. 1994). Here, accepting the complaint's allegations as true and viewing the facts in the light most favorable to GEICO, the complaint pleads conduct on behalf of the Remaining Defendants that extends beyond the mere provision of legal services, but instead details participation in a fraudulent and unlawful scheme. Accordingly, the Remaining Defendants' argument is unpersuasive, and the complaint's allegations support the Remaining Defendants' agreement to the overall objective of the conspiracy.

Altogether, GEICO's allegations are sufficient, at the pleading stage, to state a claim for RICO conspiracy against the Remaining Defendants. GEICO's allegations of parallel conduct are accompanied by a "plausibly-alleged meeting of the minds," which "'nudge [GEICO's] claims across the line from conceivable to plausible.'" *Am. Dental Ass'n*, 605 F.3d at 1296 (quoting *Twombly*, 550 U.S. at 557). As shown above,

the allegations are accompanied by "more than a bare assertion" of conspiracy. *Am. Dental Ass'n*, 605 F.3d at 1294. In addition to the detailed factual allegations described above, the complaint is accompanied by eight thousand six hundred one pages of information regarding the fraudulent bills submitted through Path Medical to GEICO. *Id.* at Ex. 1. This information is sorted by event number, claim number, the provider, the type of document mailed to GEICO, the approximate date of the mailing to GEICO, the CPT code, the number of units, and the charge for the services. *Id.*

As previously mentioned, the "most basic consideration" rooted in Rule 9(b) is fair notice. *Brooks*, 116 F.3d at 1381 (citing *Vicom, Inc.*, 20 F.3d at 778) (internal quotations omitted). Here, GEICO has provided the Remaining Defendants with fair notice of their alleged wrongdoing for its RICO conspiracy claim.

Accordingly, the Remaining Defendants' request to dismiss the RICO conspiracy claim is due to be denied.

### c.  *State Law Claims*

GEICO brings the remaining claims against the Remaining Defendants under Florida law: one claim for violation of FDUTPA (Count IV); one claim for violation of Florida RICO (Count V); one claim for aiding and abetting fraud (Count VII); and one claim for unjust enrichment (Count VIII). The Court addresses these claims in turn. As discussed in more detail below, the Court will dismiss without prejudice the FDUTPA claim and the Florida RICO claim. The Remaining Defendants' requests to

Case No.: 8:17-cv-02848-EAK-TGW

dismiss the aiding and abetting fraud claim and the unjust enrichment claim are denied.

### i.   *Litigation Privilege*

Preliminarily, Landau and L&A argue that Florida's litigation privilege bars GEICO's state law claims. (Docs. 80 at 17–19; 83 at 13–14). "The general rule concerning the litigation privilege is that litigation participants should be absolutely exempted from liability for conduct 'in the course of judicial proceedings' so long as the conduct has 'some relation to or connection with the subject of inquiry.'" *AGM Investors, LLC v. Bus. Law Group, P.A.*, 219 So.3d 920, 924 (Fla. 2d DCA 2017) (quoting *DelMonico v. Traynor*, 116 So.3d 1205, 1211 (Fla. 2013)). Florida courts have applied the litigation privilege to conduct undertaken during the litigation and conduct that is "necessarily preliminary" to judicial proceedings. *AMG Investors, LLC*, 219 So.3d at 924 (internal quotations omitted). This "necessarily preliminary" standard "ensures that the conduct shielded from liability is really of a kind that can be regarded as having been undertaken in the course of a judicial proceeding and not conduct undertaken separately from it." *Id.* As the Court has explained, "[c]onduct that is 'necessarily preliminary' to a judicial proceeding is confined to pre-suit communications that are a statutory or contractual condition precedent to suit." *Diamond Resorts Int'l, Inc. v. Aaronson*, No. 6:17-cv-1394-Orl-37DCI, 2018 WL 735627, at *6 (M.D. Fla. Jan. 26, 2018).

29

Florida's litigation privilege does not bar GEICO's state law claims. The Remaining Defendants' actions relevant to the fraudulent scheme did not occur "in the course of judicial proceedings," nor does the Remaining Defendants' conduct qualify as "necessarily preliminary" to judicial proceedings per the discussion above. *Id.* Accordingly, the Florida litigation privilege is inapplicable to GEICO's state law claims.

### *ii.  FDUTPA*

GEICO also brings a FDUTPA claim against the Remaining Defendants, contending that they "engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally[]obtain PIP benefits from GEICO." (Doc. 1 ¶521). In support of its claim, GEICO also alleges that "[t]he claims and supporting documents submitted to GEICO in connection" with the fraudulent services at the Path Medical clinics were fraudulent, based on numerous misrepresentations, such as Path Medical's eligibility to collect PIP benefits. *Id.* at ¶522. The complaint also states that the Remaining Defendants "are actively engaged in trade and commerce" in Florida, *id.* at ¶519, and that the Remaining Defendants' conduct was the actual and proximate cause of GEICO's sustained damages, *id.* at ¶524.

Rule 9(b) governs those FDUTPA claims "grounded in fraud." *PB Prop. Mgmt, Inc. v. Goodman Manuf. Co., L.P.*, No. 3:12-cv-1366-J-20JBT, 2013 WL 12172912, at *6 (M.D. Fla. Aug. 28, 2013). As explained above, GEICO's FDUTPA claim is based

on submission of claims and documents to GEICO in connection with the Path Medical clinics' fraudulent services. Thus, because GEICO's FDUTPA claim is "grounded in fraud," it is governed by Rule 9(b)'s heightened pleading standard.

Pursuant to FDUTPA, "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices of any *trade or commerce*" are unlawful. Fla. Stat. § 501.204(1) (emphasis added). FDUTPA defines "trade or commerce" as:

> [T]he advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated. "Trade or commerce" shall also include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity.

*Id.* § 501.203(8).

The Remaining Defendants assert that the complaint's allegations relate to attorney conduct, which does not constitute the requisite "trade or commerce" for a FDUTPA claim. Whether FDUTPA even applies to the attorney conduct raised in this case is a threshold issue. *See Kapila v. Militzok*, No. 15-60764-CIV, 2015 WL 7272761, at *6 (S.D. Fla. Nov. 18, 2015). Attorneys are not "automatically exempt" from the operation of FDUTPA. *Kelly v. Palmer, Reifler, & Assocs., P.A.*, 681 F. Supp. 2d 1356, 1371 (S.D. Fla. 2010). Federal district courts and Florida state courts have yet to find that attorney conduct, including conduct in both the pre-lawsuit and

litigation stages, falls within the definition of "trade or commerce." *Ellis v. Warner*, No. 15-10134, 2017 WL 634287, at *24 (S.D. Fla. Feb. 16, 2017). Nonetheless, the absence of such findings does not therefore mean "that a lawyer's *status* per se is a bar to relief." *Id.* (quoting *Kelly*, 681 F. Supp. 2d at 376) (internal quotations omitted) (emphasis added).

The Remaining Defendants contend that GEICO's FDUTPA claim against them fails because attorney conduct does not fall within FDUTPA's "trade or commerce" definition. (Docs. 80 at 19–20; 81 at 14–16; 83 at 14–15). GEICO asserts in its responses to each of the amended motions to dismiss that it is seeking to hold the Remaining Defendants liable based on the receipt of bribes, rather than the provision of legal services or attorney conduct. (Docs. 89 at 14–16; 91 at 16–18; 92 at 17–18).

Even if GEICO's argument is true, however, the initial focus is on whether the claim has facial plausibility, which occurs "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Here, accepting as true all of the complaint's allegations and viewing the facts in the light most favorable to GEICO, *Rowe*, 287 F. Supp. 3d at 1292, the complaint fails to plead factual content that allows the Court to reasonably infer that the Remaining Defendants are liable for violating FDUTPA. Specifically, the complaint fails to link the FDUTPA claim to factual allegations to show how the Remaining Defendants are "actively engaged in trade and commerce," (Doc. 1 ¶519), and "engaged in unfair, deceptive, and unconscionable

acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally[]obtain PIP [b]enefits from GEICO," *id.* at ¶521. For example, is Landau supposedly engaged in the same type of "trade and commerce" under FDUTPA as K&P, given their alleged roles? A thorough examination of the complaint does not provide the answer to this question or additional questions that arise upon review.[10] The Court will not accept bare legal conclusions as true. *Iqbal*, 556 U.S. at 678.

Thus, the FDUTPA claim fails to meet the requisite pleading standards. Accordingly, the claim is due to be dismissed without prejudice.

### *iii.*    *Florida RICO*

The complaint also includes a claim against the Remaining Defendants for violation of Florida RICO, Fla. Stat. § 772.101 *et seq.*, which is Florida's analog to federal RICO. Florida RICO is patterned on federal RICO, and courts analyze Florida RICO claims under the same analysis as federal RICO claims. *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1263–64 (11th Cir. 2004). Under Florida RICO, it is unlawful for any person:

---

[10] GEICO relies on *State Farm Mutual Automobile Insurance Company v. Physicians Group of Sarasota, LLC*, 9 F. Supp. 3d 1303 (M.D. Fla. 2014), and *State Farm Mutual Automobile Insurance Company v. Comprehensive Physician Services, Inc.*, No. 8:14-cv-2381-T-30AEP, 2014 WL 7070832 (M.D. Fla. Dec. 15, 2014), to argue that "numerous courts—including this Court—have recognized that insurers such as GEICO may assert claims under [] FDUTPA based on fraudulent insurance billing." (Docs. 89 at 15; 91 at 17; 92 at 18). While these cases may be persuasive in other respects, they are distinguishable on this issue because they do not involve attorney conduct, which this issue preliminarily hinges upon. The cases therefore are unpersuasive for analyzing the Remaining Defendants' actions, as attorneys, under FDUTPA's "trade or commerce" definition.

(1) Who has with criminal intent received any proceeds derived, directly or indirectly, from a pattern of criminal activity or through the collection of an unlawful debt to use or invest, whether directly or indirectly, any part of such proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any title to, or any right, interest, or equity in, real property or in the establishment or operation of any enterprise.

(2) Through a pattern of criminal activity or through the collection of an unlawful debt, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise or real property.

(3) Employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of criminal activity or the collection of an unlawful debt.

(4) To conspire or endeavor to violate any of the provisions of subsection (1), subsection (2), or subsection (3).

*Id.* Thus, just as federal RICO provides three substantive violations and one conspiratorial violation, 18 U.S.C. § 1962(a)–(d), Florida RICO likewise provides three substantive violations and one conspiratorial violation.

The complaint fails to specify which of the above provisions the Remaining Defendants allegedly violated, however. The complaint merely states that GEICO brings the claim "[u]nder Fla. Stat. 772.103 *et seq*," (Doc. 1 at 183), yet, as shown above, section 772.103 provides three substantive violations and one conspiratorial violation. The accompanying allegations fail to shed any light on which Florida RICO provision the claim is based on. The complaint must provide the Remaining Defendants with fair notice of the claim and its bases. *See Twombly*, 550 U.S. at 555.

Through its responses to the amended motion to dismiss, GEICO contends that "nature of the well-pleading allegations" make it clear that the Florida RICO claim "sounds solely in conspiracy." (Docs. 89 at 9; 91 at 11). Regardless of the extent to which GEICO sought to clarify its Florida RICO claim in either its prior responses to the motions to dismiss or its responses to the amended motions to dismiss, GEICO may not amend the complaint through its responses. *Grandrimo v. Parkcrest Harbour Island Condo. Ass'n, Inc.*, No. 8:10-cv-964-T-27MAP, 2011 WL 550579, at *5 (M.D. Fla. Feb. 9, 2011) ("Plaintiff cannot amend the Complaint in her brief in opposition to a motion to dismiss."). And, of course, the Court may not *sua sponte* amend GEICO's complaint. *See Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535, 559 (11th Cir. 2013). GEICO asserts that "a simple amendment" may resolve this problem. (Docs. 89 at 9; 91 at 11). Alas, amending the complaint is precisely what GEICO shall do to correct this error. Therefore, because GEICO has failed to specify which provisions of Florida RICO the Remaining Defendants allegedly violated, the claim is due to be dismissed without prejudice.

### iv.   *Aiding and Abetting Fraud*

Florida courts have assumed that a cause of action for aiding and abetting fraud exists, even though no Florida court has explicitly recognized such cause of action. *Freeman v. JPMorgan Chase Bank N.A.*, 75 F. App'x 926, 934 (11th Cir. 2017) (citing *ZP No. 54 Ltd. P'ship v. Fid. & Deposit Co. of Md.*, 917 So.2d 368, 371–72 (Fla. 5th DCA 2005)). A plaintiff must allege the following elements for a cause of action for aiding

and abetting fraud: "(1) the existence of 'an underlying fraud'; (2) that 'the defendant had knowledge of the fraud'; and (3) that the defendant 'provided substantial assistance to advance the commission of the fraud.'" *Freeman*, 675 F. App'x at 934 (quoting *ZP No. 54 Ltd. P'Ship*, 917 So.2d at 372) (internal alterations omitted).

To survive a motion to dismiss, a plaintiff who pleads a claim of aiding and abetting fraud must allege that the defendant "had actual knowledge of the wrongdoing" for the second element. *Lawrence v. Bank of Am., N.A.*, No. 8:09-cv-2162-T-33TGW, 2010 WL 3467501, at *3 (M.D. Fla. Aug. 30, 2010), *aff'd*, 455 F. App'x 904, 907 (11th Cir. 2012). *See also Wiand v. Wells Fargo Bank, N.A.*, No. 8:12-cv-00557-T-27EAJ, 2014 WL 12620819, at *3 (M.D. Fla. Mar. 6, 2014) (citing *Lawrence*, 455 F. App'x at 907). Actual knowledge may be shown by circumstantial evidence, but the circumstantial evidence must "demonstrate that the aider and abettor actually knew of the underlying wrongs committed." *Perlman v. Wells Fargo Bank, N.A.*, 559 F. App'x 988, 993 (11th Cir. 2014). There must be "allegations of specific facts that give rise to a strong inference of actual knowledge regarding the underlying fraud." *Lawrence*, 2010 WL 3467501, at *3 (internal quotations and alterations omitted). Pursuant to Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Of course, this susceptibility to Rule 9(b) does not allow GEICO to skirt around the pleading standards of Rule 8. *See Silverthorne*, 668 F. App'x at 355.

Here, GEICO alleges that H. Lewin, 411-PAIN, 411-IP, 411 Advertising, and the Remaining Defendants "knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Lewin, Manion, Permaul, Path Medical, Path Holdings, [and the Medical Directors]." (Doc. 1 ¶540). In relevant part, GEICO contends:

> The acts of H. Lewin, 411-PAIN, 411-IP, 411 Advertising, [and the Remaining Defendants] in furtherance of the fraudulent scheme include knowingly referring Insureds to Path Medical, or causing Insureds to be referred to Path Medical, in violation of the Self-Referral Act, the Patient Brokering Act, the Anti-Kickback Statute, and the Chiropractor Advertising Laws, and entering into collusive and unlawful cross-referral arrangements in an attempt to conceal their unlawful referrals and Path Medical's ineligibility to collect PIP benefits in the first instance.

*Id.* at ¶541. GEICO further asserts that: (i) the Remaining Defendants' conduct was a "necessary part of and critical to the success of the fraudulent scheme" because there would have not been an opportunity for Path Medical to secure payment from GEICO without the Remaining Defendant's actions; (ii) the Remaining Defendants "aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Path Medical . . . because [they] sought to continue profiting from the fraudulent scheme"; and (iii) the Remaining Defendants caused GEICO to pay more than $15 million in fraudulent bills. *Id.* at ¶¶542–44. The Remaining Defendants argue, chiefly, that GEICO has failed to sufficiently allege a cause of action for aiding and

abetting fraud because the complaint fails to sufficiently allege actual knowledge or substantial assistance.[11] (Docs. 80 at 21–24; 81 at 19–23; 83 at 19–20).

Mindful of Rule 9(b)'s relaxed standard for pleading knowledge, Fed. R. Civ. P. 9(b), accepting as true all of the complaint's allegations, and viewing the facts in the light most favorable to GEICO, *Rowe*, 297 F. Supp. 3d at 1292, the complaint allows the Court "to draw the reasonable inference that [the Remaining Defendants are] liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678. Despite the Remaining Defendants' contention, the complaint plausibly alleges that the Remaining Defendants had actual knowledge of the purportedly fraudulent scheme and provided substantial assistance to advance the commission of the alleged fraud. First, the complaint provides ample factual allegations showing, through circumstantial evidence, the Remaining Defendants' actual knowledge of the underlying fraud. As discussed continuously herein, Kanner, Pintaluga, and K&P perpetually referred clients received from 411-PAIN to the Path Medical clinics, which would provide fraudulent medical services (to the extent such services were provided at all). The subsequent submission of bills to GEICO for the medical services would allow Kanner, Pintaluga, and Landau, through L&A, to receive lucrative attorney's fees as a result of the fraudulent medical services when pursuing collection lawsuits against

---

[11] Landau also argues that that "there could be no underlying fraud concerning these claims which Landau's conduct, as a lawyer providing legal services related to contested claims, could aid or abet." (Doc. 80 at 23). This argument misses the mark by construing Landau's conduct as merely providing legal services. As GEICO highlights in its response, it is seeking to hold Landau liable, instead, for "fraudulent Path Medical claims that never would have materialized . . . or [been] submitted absent [the Remaining Defendants'] pervasive violations of the Patient Brokering Act, Anti-Kickback Statute, and Self-Referral Act, in which Landau played an integral part." (Doc. 92 at 20 n.16).

GEICO. The fraudulent medical services would also serve as basis for personal injury lawsuits filed by Kanner, Pintaluga, and K&P. Furthermore, as additional consideration for the referral of clients by Kanner, Pintaluga, and K&P to the Path Medical clinics, Kanner, Pintaluga, and Landau received up to fifty percent of settlements resulting from client referrals from 411-PAIN to Michigan personal injury attorneys. In further support, the complaint includes numerous examples and over eight thousand pages of bills as an exhibit.

Viewing these allegations in the light most favorable to GEICO, the complaint sufficiently alleges—at the pleading stage—that the Remaining Defendants had actual knowledge of the violations of the Self-Referral Act, the Patient Brokering Act, the Anti-Kickback Statute, and the Chiropractor Advertising Laws by Lewin, Manion, Permaul, Path Medical, Path Holdings, and the Medical Directors, as well as the fraudulent charges submitted to GEICO. Indeed, the nature of the Remaining Defendants' received consideration and involvement in the scheme, the extensively detailed relationships between the Remaining Defendants and other defendants, and the Remaining Defendants' actions to purportedly ensure continuous referrals and billing supplies "a strong inference of actual knowledge regarding the underlying fraud." *Lawrence*, 2010 WL 3467501, at *3 (internal quotations and alterations omitted).

Similarly, viewing the allegations in the light most favorable to GEICO demonstrates that the complaint sufficiently pleads that the Remaining Defendants

provided substantial assistance to advance the underlying fraud's commission. For example, after Kanner, Pintaluga, and K&P received clients from 411-PAIN (often at Lewin or H. Lewin's direction), Kanner, Pintaluga, and K&P referred clients back to Lewin through the Path Medical clinics, which produced falsified medical services, thereby generating higher income when the bills for the medical services were submitted to GEICO. Path Medical, Path Holdings, Lewin, Permaul, and Manion would subsequently fail to timely reimburse GEICO under the Self-Referral Act for those payments made by GEICO. At the same time, the referral and fraudulent medical services ensured more attorney's fees when L&A, which was owned by Landau, Kanner, and Pintaluga, pursued collection lawsuits against GEICO, and they also served to potentially inflate the value of the personal injury lawsuits filed by Kanner, Pintaluga, and K&P on behalf of the referral clients. Meanwhile, a "secret arrangement to funnel additional consideration" for the referrals led to Landau, Kanner, and Pintaluga, through MCAA, receiving up to fifty percent of settlements from Michigan attorneys participating in the 411-PAIN referral service network, despite not performing any work on such cases. (Doc. 1 ¶201). Thus, as pleaded, the complaint details how each step within the intricate arrangement was supported by the previous step and designed to support the next step. These actions were clearly carried out to advance the fraud perpetrated on GEICO.

Therefore, the Remaining Defendants' request to dismiss the aiding and abetting claim is due to be denied.

Case No.: 8:17-cv-02848-EAK-TGW

### v.    *Unjust Enrichment*

The Remaining Defendants argue that GEICO's unjust enrichment claim should be dismissed because, chiefly, the complaint does not allege that GEICO conferred a benefit on the Remaining Defendants. (Docs. 80 at 24–25; 81 at 23–25; 83 at 21–22). L&A also asserts that any benefits conferred on L&A were for proper consideration, (Doc. 83 at 22–23), and both L&A and Landau argue that unjust enrichment cannot lie for an actionable tort, (Doc. 80 at 25–26; Doc. 83 at 23–24). For the reasons set forth below, the Court denies the Remaining Defendants' request to dismiss GEICO's unjust enrichment claim.

Although unjust enrichment is "equitable in nature and is, therefore, not available where there is an adequate legal remedy, a plaintiff may maintain an unjust enrichment claim in the alternative to its legal claims." *Aceto Corp. v. TherapeuticsMD, Inc.*, 953 F. Supp. 2d 1269, 1287 (S.D. Fla. 2013). A claim for unjust enrichment under Florida law is composed of four elements: "(1) the plaintiff must confer a benefit upon the defendant; (2) the defendant must have knowledge of the benefit; (3) the defendant accepts and retains the benefit; and (4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof." *Physicians Group of Sarasota, L.L.C.*, 9 F. Supp. 3d at 1311–12 (citing *Jackson–Jester v. Aziz*, 48 So.3d 88, 90 (Fla. 2d DCA 2010)). Particularly relevant, the Supreme Court of Florida recently emphasized "the plaintiff must directly confer a benefit to the defendant" to satisfy the first element of this test. *Kopel v. Kopel*, 229

Case No.: 8:17-cv-02848-EAK-TGW

So.3d 812, 818 (Fla. 2017). In analyzing unjust enrichment claims under Florida law, the Eleventh Circuit Court of Appeals has reiterated the Supreme Court of Florida's recognition of a direct benefit. *See, e.g.*, *Johnson v. Catamaran Health Solutions, LLC*, 687 F. App'x 825, 830 (11th Cir. 2017) ("And as to the first element, the benefit conferred on the defendant must be a *direct* benefit.") (emphasis in original).

"When defendants act in concert to unjustly obtain benefits, each can be held to have been unjustly enriched by virtue of the benefit derived from the scheme, even if the benefit was not conferred directly on them." *State Farm Mut. Auto. Ins. Co. v. Brown*, 2017 WL 1291995, at *7 (S.D. Fla. Mar. 30, 2017) (citing *State Farm Mut. Auto. Ins. Co. v. Kugler*, No. 11-cv-80051, 2011 WL 4389915, at *12 (S.D. Fla. Sept. 21, 2011)). *See also State Farm Fire & Cas. Co. v. Silver Star Health & Rehab Inc.*, No. 6:10-cv-1103-Orl-31GJK, 2011 WL 6338496, at *6 (M.D. Fla. Dec. 19, 2011) (holding that defendant-owner would have received "a sufficiently direct benefit" from the plaintiff if defendant-entity was merely a pass-through-entity); *Williams v. Wells Fargo Bank N.A.*, No. 11-21233-CIV, 2011 WL 4901346, at *5 (S.D. Fla. Oct. 14, 2011) ("It would not serve the principles of justice and equity to preclude an unjust enrichment claim merely because the 'benefit' passed through an intermediary before being conferred on a defendant.").

In *Kugler*, State Farm brought a lawsuit against twelve defendants, alleging that the defendants engaged in a conspiracy to defraud them by performing medically superfluous services on State Farm's insureds. *Kugler*, 2011 WL 4389915, at *1. As

part of the defendants' scheme, fraudulent bills and supporting information for these unnecessary services were sent to State Farm through patients' attorneys. *Id.* State Farm alleged that the scheme had fraudulently induced it to pay more than $13 million in various insurance claims. *Id.* In moving to dismiss the complaint, the defendants argued, *inter alia*, that State Farm's unjust enrichment claim should be dismissed because the complaint failed to allege that State Farm paid the defendants directly, thereby foreclosing the possibility of the defendants enjoying the conferral of any benefit and defeating the first element of an unjust enrichment claim. *Id.* at *12. The court rejected this argument, explaining that it was "reasonable to infer that the defendants benefitted from the fraudulent scheme alleged in the complaint when the patient's attorney collected first and third party settlement monies from State Farm and disbursed the proceeds directly to all medical lienors on the patient's behalf" even though State Farm did not disburse any payments for fraudulent claims directly to the medical defendants. *Id.*

Here, like *Kugler*, GEICO alleges that it was fraudulently induced to pay the charges, as it "reasonably believed that it was legally obligated to make such payments based on the Defendant's improper, unlawful and/or unjust acts." (Doc. 1 ¶549). The Remaining Defendants move to dismiss the unjust enrichment claim on the grounds that the complaint does not allege that GEICO conferred a benefit on them. (Docs. 80 at 24–25; 81 at 23–26; 83 at 21–22). Like *Kugler*, the Remaining Defendants participated in a scheme to defraud GEICO, which did not involve their direct

submission of fraudulent bills to GEICO. Nonetheless, as the *Kugler* court found, inferring that the Remaining Defendants benefitted from the fraudulent scheme alleged in the complaint is reasonable. Indeed, the Remaining Defendants "act[ed] in concert to unjustly obtain benefits," and thus "each can be held to have been unjustly enriched by virtue of the benefit derived from the scheme, even if the benefit was not conferred directly on them." *Brown*, 2017 WL 1291995, at *7 (similarly rejecting a defendant's argument that the plaintiff-insurer's unjust enrichment claim failed because the plaintiff had not alleged that it "paid any money" to the defendant). *See also Physicians Group of Sarasota, L.L.C.*, 9 F. Supp.3d at 1312 ("It can reasonably be inferred that individuals intimately involved with the organization and operation of the entity that directly received a benefit have benefitted themselves so as to support a claim for unjust enrichment against them in their individual capacities.") (internal quotations omitted).

The complaint contains sufficient allegations, which the Court must accept as true, *Rowe*, 297 F. Supp. 3d at 1292, to support GEICO's purported conferral of a direct benefit on the Remaining Defendants. As explained above, GEICO's allegations involve thorough descriptions of the Remaining Defendants' individual roles in the arrangement, explanation of the consideration received by the Remaining Defendants, and abundant examples. The complaint is also accompanied by over eight thousand pages listing the fraudulent charges submitted to GEICO through Path Medical. The

Remaining Defendants' argument that GEICO did not confer a benefit upon them is unpersuasive.

To the extent that Landau and L&A argue that unjust enrichment cannot lie for an actionable tort, (Docs. 80 at 25–26; 83 at 23–24), the Court finds such argument unpersuasive, as the Court has previously declined to recognize any distinction between "unjust enrichment" and "wrongful enrichment." *See Absolute Activist Value Master Fund Ltd. v. Devine*, 233 F. Supp. 3d 1297, 1329 (M.D. Fla. 2017) ("[T]he Court cannot find, nor have the parties provided, any Florida legal authority for the proposition that an unjust enrichment claim under Florida law cannot be premised upon wrongful conduct."); *Silver Star Health & Rehab Inc.*, 2011 WL 6338496, at *6 (finding that the line of federal cases which have drawn a distinction between "unjust enrichment" and "wrongful enrichment" is based on a single law review article with no mention of Florida law, and explaining that Florida courts have not recognized such distinction).

Finally, Landau's argument that a claim of unjust enrichment fails generally when a defendant has provided adequate consideration to a plaintiff for the benefit conferred is correct. *Physicians Group of Sarasota, L.L.C.*, 9 F. Supp. 3d at 1312 (citing *Am. Safety Ins. Serv., Inc. v. Griggs*, 959 So.2d 322, 331–32 (Fla. 5th DCA 2007)). "Unlawfully rendered services, however, cannot qualify as adequate consideration." *Physicians Group of Sarasota, L.L.C.*, 9 F. Supp. 3d at 1312. If the Path Medical clinics' medical services were unlawfully rendered, GEICO was not under any obligation to

45

pay for such services pursuant to the No-Fault Law. Fla. Stat. § 627.736(5)(b)(1)(b). Therefore, "the retention of these payments can therefore substantiate a claim for unjust enrichment." *Physicians Group of Sarasota, L.L.C.*, 9 F. Supp.3d at 1312.

Accordingly, the Remaining Defendants' request to dismiss the unjust enrichment claim is due to be denied.

### d. Motion to Strike

Pintaluga also moves to strike paragraphs 47 and 48 of the complaint under Rule 12(f) of the Federal Rules of Civil Procedure. This request to strike paragraphs 47 and 48 is due to be denied.

Pursuant to Rule 12(f), a court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). A motion to strike is a "drastic remedy[,] which is disfavored by the courts and will *usually be denied* unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties." *Thompson v. Kindred Nursing Ctrs. E., LLC*, 211 F. Supp. 2d 1345, 1348 (M.D. Fla. 2002) (internal quotations omitted) (emphasis added).

Here, paragraphs 47 and 48 relate to Pintaluga's public reprimanding by the Florida Bar for "failing to hold personal injury settlement proceeds in his trust account" and "failing to interplead the settlement proceeds to the court, when the disposition of the settlement proceeds was in dispute." (Doc. 1 ¶47). In paragraph 48,

GEICO alleges that this public reprimanding motivated Pintaluga to participate in the fraudulent scheme because he experienced difficulty in obtaining legitimate client referrals. *Id.* at ¶48.

Pintaluga objects to paragraphs 47 and 48 because they are unrelated to the issues raised in the complaint and represent "a transparent attempt by GEICO to disparage and embarrass" him and "inflame and prejudice the trier of fact against him." (Doc. 81 at 26–27). The Court disagrees. These paragraphs bear sufficient relation to the controversy, as they pertain to Pintaluga's involvement in the alleged scheme. Furthermore, the paragraphs do not cause prejudice to Pintaluga, and their content does not constitute "redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).

Accordingly, Pintaluga's motion to strike is due to be denied.

## V.   **Conclusion**

Accordingly, it is **ORDERED** that:

1. The Law Offices of Kanner & Pintaluga, P.A., Howard Kanner, and Eric Pintaluga's Amended Motion to Dismiss Complaint and Strike Allegations, (Doc. 81), is **GRANTED IN PART AND DENIED IN PART**, to the extent that the Court dismisses Counts IV and V of the complaint without prejudice. The request to dismiss Counts III, VII, and VIII is denied;

Case No.: 8:17-cv-02848-EAK-TGW

2. Counts IV and V of GEICO's Complaint, (Doc. 1), are **DISMISSED WITHOUT PREJUDICE**, to GEICO's right to file an amended complaint on the Court's docket within twenty-one (21) days of the date of this Order, consistent with the dictates of this Order;

3. Todd Landau's Amended Motion to Dismiss Complaint and request for oral argument therein, (Doc. 80), are **DENIED AS MOOT**;

4. Landau & Associates, P.A.'s Amended Motion to Dismiss Plaintiffs' Complaint for Failure to State a Claim, (Doc. 83), is **DENIED AS MOOT**; and

5. The stay on discovery, (Doc. 106), remains in place.

**DONE** and **ORDERED** in Chambers in Tampa, Florida this 29th day of March, 2019.

ELISABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record